## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EASTERN STATES CONSTRUCTION SERVICE, INC., | ) ) ) | |
| PLAINTIFF, | ) ) ) | |
| v. | ) ) | C.A. No. N21C-07-188 SPL |
| DARLEYCAP, LLC, SPRINGCAP II, LLC WILLOWCAP, LLC, AND ST. ANNES DEVELOPMENT ASSOCIATES, LLC | ) ) ) ) | |
| DEFENDANTS. | ) ) | |
| _____ DARLEYCAP, LLC, SPRINGCAP II, LLC WILLOWCAP, LLC, AND ST. ANNES DEVELOPMENT ASSOCIATES, LLC | ) ) ) ) ) | |
| COUNTERCLAIM PLAINTIFFS, | ) ) | |
| v. | ) ) | |
| EASTERN STATES CONSTRUCTION SERVICE, INC., | ) ) ) | |
| COUNTERCLAIM DEFENDANT. | ) | |

Submitted: May 30, 2025
Decided: September 29, 2025

## POST-TRIAL DECISION

David E. Wilks, Esquire, Charles D. Vavala, Esquire, WILKS LAW, Wilmington, Delaware, *for Plaintiff-Counterclaim Defendant Eastern States Construction Service, Inc.*

Sean A. Meluney, Esquire, Matthew D. Beebe, Esquire, MELUNEY, ALLEMAN & SPENCE, Lewes, Delaware, *for Defendants-Counterclaim Plaintiffs Darleycap, LLC, Springcap II, LLC, Willowcap, LLC, and St. Annes Development Associates, LLC*

**LUGG, Judge**

## I.  INTRODUCTION

This case involves a contract dispute between two established Delaware companies—Eastern States Construction Service, Inc. ("Eastern States") and the Capano Management Company.  The parties agree that contracts defined their relationship; they quibble over their performance under the contracts.  Each asserts the other breached and owes some measure of damages.  Over the course of a six-day bench trial, the parties endeavored to unwind their relationship and prove their respective claims.

These two longstanding businesses worked together for years.  While contracts defined their relationship, they routinely worked outside the contracts to accommodate each other.  Deadlines passed, payments were missed, and projects were delayed.  Over time, the relationship degraded.  Leaders of the companies met to resolve their differences, but the conflict steadily grew.  In late 2020, the relationship ended with a terse voicemail message.  Each business believes the other's shortcomings excused their own failure to perform and packaged these failures as breaches of the underlying contracts.  The Court must determine whether one, the other, or both, broke the deal.  The answer is not simple.

Darleycap, LLC ("Darleycap"), Springcap II, LLC ("Springcap"), Willowcap, LLC ("Willowcap"), and St. Anne's Development Associates, LLC ("St. Anne's") (collectively "Developers") are the management entities for properties then under

1

development by the Capano Management Company. Developers hired Eastern States to perform heavy civil site development on undeveloped land managed by Darleycap, Springcap, Willowcap, and St. Anne's. Developers sought to prepare the land for vertical construction—buildings and residences. Preparing undeveloped land for vertical construction is no easy task; ground must be broken, cleared, smoothed, and readied to support the various utilities required for 21st Century homes and businesses. Of course, unforeseen and unanticipated challenges are inherent in the process.

Developers expected Eastern States to perform under their contracts. After all, unimproved land does not attract bids for further development. In exchange for its work, Eastern States, of course, expected to be paid. These expectations led to persistent disputes. When Eastern States failed to adhere to the contracts, Developers would not pay, and when Developers would not pay, Eastern States would "demobilize." Demobilizations ranged from pulling resources off Developers' projects to a complete cessation of work. This volley continued until December 16, 2020, when Louis J. Capano, III ("Capano"), Developers' owner, left a voicemail with Eastern States' Vice President, Terence Gleason ("Gleason"), terminating the parties' contractual relationship. Capano ordered Eastern States off all of Developers' projects. Eastern States collected its equipment and materials, and this litigation commenced.

2

Eastern States filed suit for breach of contract and unjust enrichment. Developers counterclaimed, asserting similar claims to recover the sums they spent to fix and finish Eastern States' work. The Court finds that both parties breached the contracts and owe damages to one another. In the end, offsetting the damages, the Court awards judgment to Eastern States in the amount of $212,232.75. The Court declines to award attorneys' fees to either party.[1]

---

[1] Developers shall receive credit in the final form of order for payments made to Springcap and Darleycap. *See infra* notes 280, 283, and 294; JX 294, JX 454.

## II. FACTS AND PROCEDURAL HISTORY

### A. The Parties

Eastern States is a family-owned civil site development and underground utility contractor incorporated under Delaware law.[2] Eastern States transforms undeveloped land into property prepared for vertical construction.[3] At all times relevant to this dispute, Stephen Julian ("Julian") served as Eastern States' President,[4] Gleason, a decades-long employee of Eastern States, served as Vice President,[5] and Matt Green ("Green"), served as Eastern States' general superintendent.[6] While Julian and Gleason often visited job sites, Green acted as Eastern States' "boots on the ground" and oversaw the day-to-day operations.[7]

Developers—Darleycap, Springcap, Willowcap, and St. Anne's—are the quasi-eponymous business entities associated with the properties under development by the Capano Management Company owned by Capano.[8] Developers contracted with Eastern States to prepare undeveloped properties for vertical construction

---

[2] Trial Tr. Day 1 at 18:5-23.

[3] Trial Tr. Day 1 at 20, 25.

[4] Trial Tr. Day 1 at 24.

[5] Trial Tr. Day 1 at 263-264.

[6] Trial Tr. Day 2 at 214.

[7] Trial Tr. Day 6 at 246.

[8] Trial Tr. Day 6 at 8–9.

projects.[9]  Capano's second-in-command, Justin Hensley ("Hensley"), served as Developers' Director of Land Development,[10] and operated as Developers' primary contact throughout their relationship with Eastern States.  William Krapf ("Krapf"), after years overseeing site development work for Developers, served in this role prior to Hensley.[11]

## B. The Projects

Eastern States worked on several projects for Developers; four are the subject of this dispute.  Darleycap served as the business entity overseeing the development of Darley Green, a residential for-sale neighborhood in New Castle County.[12]  The Darleycap project sought to develop about 800 "mixed use" units and required approximately eleven "phases" of construction.[13]  St. Anne's oversaw the development of the Estate of St. Anne's, a neighborhood located in New Castle County comprised of about 600 home units.[14]  Willowcap oversaw the development of Willowood, a 500 lot neighborhood located off Brenford Road in Kent County.[15]

---

[9] JX 663 (Darleycap Contract), JX 664 (Willowcap Contract), JX 081 (Springcap Contract), JX 665 (St. Anne's Contract) ("Contracts").

[10] Trial Tr. Day 3 at 85.

[11] Trial Tr. Day 4 at 42.

[12] Trial Tr. Day 3 at 89.

[13] *Id*.

[14] *Id*.

[15] Trial Tr. Day 3 at 90.

Like Darleycap, the Willowcap project involved phased construction.[16] Springcap oversaw the development of a neighborhood situated "off Conleys Chapel Road in Lewes, Delaware."[17] The Springcap project called for Eastern States to work on the internal roadway of Burtons Pond, and Conleys Chapel Road.[18]

### C. The Parties' History

Eastern States and Developers began working together in 2012, when Capano initiated the Darley Green project.[19] The parties' relationship expanded from there.[20] Satisfied with their work, Capano invited Eastern States to bid on additional projects.[21] By 2018, Eastern States became Developers' site developer on all projects relevant to this litigation.

Developers tasked Eastern States with complex work. Transforming an untouched parcel into land prepared for development is a challenging endeavor. For Eastern States to prepare Developers' land, it must clear the ground, install sewer systems and water lines, construct facilities, and install roads and curbs.[22] The

---

[16] Trial Tr. Day 3 at 90.

[17] *Id*.

[18] D.I. 112 ("Def. Op. Br.") 4.

[19] Trial Tr. Day 1 at 266.

[20] Trial Tr. Day 1 at 94.

[21] Trial Tr. Day 1 at 94.

[22] Trial Tr. Day 1 at 37.

projects often spanned several years, and while the contracts captured the general contours of the work, they did not capture the minutiae and the unforeseen, day-to-day hurdles that arise during heavy civil site development. Neither Eastern States nor Developers dispute that the contracts are valid and enforceable.

## D. The Parties' Contractual Relationship

Between 2012 and 2018, Eastern States and Developers entered into the four contracts—the Darleycap Project, St. Anne's Project, Willowcap Project, and Springcap Project—("Contracts") relevant to this case. Julian explained that throughout the process, Eastern States never "had to call a lawyer in a negotiation of a contract" because "[t]he Capano organization always provided [the] contract[s]."[23] It became apparent at trial that Eastern States and Developers did not heavily negotiate their business relationship.[24] From project to project, some contractual provisions were edited or removed, but the terms germane to the parties claims remained the same; most variations involved descriptions of land and the amount Developers were required to pay Eastern States for each job.[25]

While the general terms set forth in each of the contracts governing the four projects were virtually identical, rarely were the contracts terms strictly followed by

---

[23] Trial Tr. Day 1 at 40.

[24] Trial Tr. Day 1 at 39-40.

[25] Trial Tr. Day 1 at 99.

either party. As Gleason put it, "[w]hen you open up the ground, things can be different" than what the parties assumed at the time they signed the Contracts.[26] And things often were different. For larger unforeseen circumstances arising during a project, Eastern States submitted change orders to Developers.[27] These change orders included additional work, additional payment,[28] and often necessitated schedule changes. According to Julian, those in the construction industry "deal with [change orders] all the time."[29]

Smaller adjustments or fixes, often referred to as "punch list" items, also arise "all the time" and are an unavoidable component of site development.[30] While not reduced to change orders, the parties generally agreed that punch list items would be remedied prior to project completion. As the projects progressed, the Authority Having Jurisdiction ("AHJ")—in this case, DelDOT—would flag correctable issues and bring them to Eastern States' and Developers' attention through these punch lists.[31] Punch list items varied in severity; some were quick fixes, others required

---

[26] Trial Tr. Day 1 at 45.

[27] *Id*.

[28] Trial Tr. Day 1 at 45-47.

[29] Trial Tr. Day 1 at 46.

[30] Trial Tr. Day 1 at 87.

[31] Trial Tr. Day 3 at 11-12.

8

Eastern States to spend more significant time.[32]  Until DelDOT approved Eastern States' punch list corrections, the work was deemed incomplete.[33]  Green testified that prior to December 16, 2020, Capano had never terminated Eastern States for failing to meet DelDOT's approval.[34]

### *The Contracts' Terms*

The relevant Contracts stood as separate agreements, but key provisions were consistent across the documents.[35]

***Monthly Invoices.***  Section 5.1 required Developers to "make payments to [Eastern States] on the basis of applications for payment submitted by [Eastern States] to [Developers] as the Work progresse[d]."[36]  The Contracts limited Eastern States' payment applications to "one (1) time in any calendar month," and, "[t]he billing period [was] monthly."[37]  Eastern States, by the fifth of each month, was required to submit its invoices through an American Institute of Architects ("AIA") payment form, which assigned industry standard percentages to different tasks

---

[32] Trial Tr. Day 1 at 87-88.

[33] Trial Tr. Day 2 at 231.

[34] Trial Tr. Day 2 at 230.

[35] See generally, Contracts.

[36] Contracts § 5.1.

[37] *Id*.

within an entire project.[38]  Then, within one calendar month of Eastern States' AIA submission, Developers were to pay Eastern States.[39]  For each invoice, Eastern States billed Developers for the percentage of the work completed in a given month with the sum determined by applying that percentage to the total cost of the project.[40]

*Pay-When-Paid Provision.*  Section 5.5, the "pay-when-paid" provision, required Developers to pay Eastern States for its "satisfactory performance . . . within thirty (30) days of receipt of [Eastern States'] application for payment out of such amounts as have been paid to [Developers] for the Work performed by [Eastern States] to which such application for payment applies."[41]  The pay-when-paid provision allowed Developers to pay Eastern States using money supplied by a third-party (*e.g.*, by a bank draw) within thirty days of Eastern States' applications for payment.  While Eastern States "never knew where a payment was coming from"[42] and rejected the idea that the pay-when-paid provision applied to Eastern States' and Developers' relationship at all,[43] Hensley insisted that pay-when-paid provisions are

---

[38] Contracts at 1.

[39] *Id*.

[40] Trial Tr. Day 1 at 105-107.

[41] Contracts § 5.5.

[42] Trial Tr. Day 1 at 111.

[43] Trial Tr. Day 2 at 19.

10

necessary in "any job that has financing," including the relevant projects.[44] And, Hensley explained, if Developers "didn't receive that money, [Developers] didn't pay it."[45]

*Holdback Provision.* Section 5.3 allowed Developers to withhold payments "in [their] sole discretion and without further notice to [Eastern States] if [Eastern States] defaults in performance . . . or fails to perform the Work in accordance with the provisions [of the contract] or if [Developers] dispute such payments."[46] To Developers, the Holdback Provision provided them "some recourse" had Eastern States not corrected its work.[47] But, it was not until December 2020 that Capano "ended up holding payments."[48]

*Notice Provision.* Under Section 5.7, the "Notice Provision," Developers could "dispute any application by [Eastern States] or other claim for payment by notice (which may be by telephone, fax or e-mail) to [Eastern States] given within seven (7) calendar days after receipt of the duly submitted application for payment

---

[44] Trial Tr. Day 3 at 108.

[45] *Id.*

[46] Contracts § 5.3.

[47] Trial Tr. Day 3 at 107.

[48] *Id.*

or other claim for payment."[49]  Developers never provided notice that Eastern States had failed to comply with any of the Contracts' terms.[50]

## E. Tensions Grow

Eastern States and Developers held biweekly progress meetings; Julian, Gleason, and Green attended for Eastern States, and Hensley participated for Developers.[51]  Capano did not attend the progress meetings.[52]  These meetings were held to address, among other things, project delays and payment issues.[53]  Developers' failure to pay invoices "was a topic that was always present" at these meetings and throughout the parties' relationship.[54]  Of course, both parties had issues with the other's contractual compliance.  While Eastern States pressed Developers for payment, Developers implored Eastern States to stay on schedule.[55]

Throughout 2018 and 2019, in response to unpaid invoices, Eastern States demobilized on Developers' projects.[56]  This included "removing resources,

---

[49] Contracts § 5.7.

[50] Trial Tr. Day 1 at 256; Trial Tr. Day 2 at 195.

[51] Trial Tr. Day 1 at 119.

[52] *Id*.

[53] Trial Tr. Day 1 at 119-121.

[54] Trial Tr. Day 1 at 121.

[55] Trial Tr. Day 3 at 113-114.

[56] Trial Tr. Day 2 at 20.

equipment, tools, [and] materials from [the] project."[57]  Eastern States engaged in demobilization as a last resort, and only when Developers had "large sums of money that [were] significantly delinquent."[58]

Developers financed the projects from various sources.[59]  For some projects, Developers would enter into an agreement with DelDOT under which DelDOT would contribute funding.[60]  For other projects, Developers' received bank draws after the bank's inspector verified Eastern States' work.[61]  Understandably, Eastern States was not concerned with the source of Developer's funding, "as long as [Eastern States] got paid in the end."[62]

In July of 2019, Capano, believing that "every job was significantly behind schedule and really affecting [Developers'] ability to do business," requested a meeting with Eastern States.[63]  Both parties were well-represented at this meeting— Julian, Gleason, and Green appeared for Eastern States, and Capano, Hensley, and Krapf represented Developers.[64]  Capano wanted the projects to "move faster," and

---

[57] Trial Tr. Day 1 at 78.

[58] Trial Tr. Day 1 at 80.

[59] Trial Tr. Day 1 at 114-115.

[60] *Id.*

[61] Trial Tr. Day 6 at 13-14.

[62] Trial Tr. Day 2 at 21.

[63] Trial Tr. Day 1 at 138-139; Trial Tr. Day 6 at 14–15.

[64] Trial Tr. Day 1 at 139.

Eastern States wanted to be paid for its work.[65]  Eastern States affirmed its ability to complete the work and left the meeting with the understanding that its "end of the bargain was getting the work done.  [Developers'] end of the bargain was paying [Eastern States] in 60 days."[66]

In the months following the meeting, Eastern States performed a large amount of site work on Developers' projects and invoiced Developers accordingly.[67]  Sixty days came and went, and Eastern States was not paid.  On October 2, 2019, a member of Eastern States' accounting department emailed Hensley and asked for a "payment status" regarding a $250,800 invoice more than sixty days old, and a $124,454.50 invoice more than ninety days old.[68]  Hensley told Julian that Developers were moving money around; they expected to "be funded early next week" and were "pressing on closing the loan this week to receive funding."[69]  Julian informed Hensley that Eastern States was "becoming increasingly frustrated with the hollow statements and lack of progress [toward] being paid in a timely manner," and in the

---

[65] Trial Tr. Day 6 at 15.

[66] Trial Tr. Day 1 at 140–141.

[67] Trial Tr. Day 1 at 145.

[68] JX 138.

[69] *Id*.

event payments were not received, Eastern States would again be forced to demobilize.[70]

It was not until summer 2020 that Eastern States, in response to "significant" nonpayment, demobilized again.[71] By September 24, 2020, Developers were 117 days overdue on a $200,000.00 payment for St. Anne's, sixty-one days overdue on a $257,260.00 payment for Willowcap, and approaching sixty days overdue on a $301,279.50 payment for Springcap.[72] In response to Eastern States' summer demobilization, Developers brought some, but not all, outstanding accounts up to date. On December 2, 2020, Developers were ninety-six days late on a $153,150.00 payment for Springcap, 126 days late on an additional $160,000.00 payment for Springcap, and sixty-three days late on a $108,800.00 payment for Willowcap.[73]

Throughout 2019 and 2020, DelDOT representatives brought to Developers' attention several instances of Eastern States' defective work. David Scott ("Scott"), DelDOT's Central District Subdivision Manager who oversaw the Willowcap project, found that significant portions of Brenford Road needed to "be removed and replaced" to satisfy DelDOT's rideability specifications.[74] Richard Larkin

---

[70] *Id.*

[71] Trial Tr. Day 1 at 146-147.

[72] JX 188.

[73] JX 207.

[74] JX 118.

("Larkin"), a DelDOT Utility Coordinator, testified that Eastern States' work on Springcap did not meet DelDOT's standards—such as "a hump in the road."[75]

On December 3, 2020, Scott emailed Hensley and informed him of corrections needed on Brenford Road in the Willowcap project.[76] Hensley, including Eastern States on his email, responded to Scott to schedule an on-site meeting to "review all the Brenford Road issues."[77] Hensley assumed, based on Scott's email, that DelDOT would refuse to perform a formal inspection on Developers' projects until Eastern States corrected its work because a project was not considered complete until these DelDot punch list items were addressed.[78] The parties met on site to review DelDOT's concerns, and Brandon Bunting—an Eastern States site supervisor—recorded the various issues and planned corrective measures.[79]

### F. Capano Terminates the Contracts

On December 8, 2020, five days after the parties met with DelDOT, Hensley emailed Gleason and asked him to "send good schedules [for fixing the DelDOT issues] over for Darley Green, willowwood, and burtons pond" because Developers

---

[75] D.I. 112, 37.

[76] JX 211.

[77] *Id*.

[78] Trial Tr. Day 1 at 137.

[79] Trial Tr. Day 3 at 146–147.

were "thinking of ways to keep both parties satisfied moving forward."[80]  Despite myriad issues, Hensley remained optimistic that Developers and Eastern States could continue to work together.  On December 15, 2020, Gleason replied with the requested proposed schedules.[81]  The next day, Capano called Gleason and left a voicemail:

> Terry, hey, it's uh Louis Capano.  I just received your schedule for Burton's Pond, and it looks as though you don't want to work for us.  So, um, I just want to catch up with you and figure out how we, um, separate here.  Um, we have your checks, um, but you know obviously, this is a substantial cost to us, so we have to figure out how to separate.  You know, giving us a schedule for April on a job where you have to run water and pave is, obviously you just don't care about doing the job.  So, we're just gonna move on.  Um, based on your schedule and uh I guess we figure out the money however you want to.  Give me a call.[82]

Gleason, unsure of Capano's intent, emailed Krapf and Hensley and asked them to "clarify in writing" what Capano meant by his voicemail.[83]  Neither Hensley nor Krapf responded to Gleason's email.  On December 18, 2020, Gleason called Capano, again requesting clarification.[84]  Capano told Gleason that he had terminated Eastern States from all jobs that Developers had contracted them to

---

[80] JX 222.

[81] *Id.*

[82] D.I. 9 ("Am. Compl.") ¶ 12.

[83] JX 227.

[84] Trial Tr. Day 2 at 82-83.

complete.[85]  Gleason, to no avail, advised Capano that the schedules were reasonable; the call ended with a complete termination of all the Contracts.[86]  Lest any doubt remain, Capano testified at trial that he intended to completely terminate Eastern States' from all of Developers projects, that it was solely his decision, and that he did not confer with any of his employees before leaving the voicemail.[87]  Capano never contacted Julian to discuss the termination; in fact, they had not spoken since the summer 2019 meeting where Eastern States confirmed its ability to complete the work on the Developers open projects.[88]

Gleason emailed Krapf and Hensley to inform them that "based on [Capano's] verbal direction, no further work will be performed on any sites," and that "[d]emobilization will proceed and be completed by 12/31/20."[89]  Green testified that he spoke with Hensley "to try to work things out" after Capano's voicemail, but Eastern States received no further response or direction from Developers.[90]  On January 6, 2021, Gleason emailed Krapf and Hensley to inform them that "Eastern

---

[85] Trial Tr. Day 2 at 82-83.

[86] *Id*.

[87] Trial Tr. Day 6 at 53-54.

[88] Trial Tr. Day 1 at 152-153.

[89] JX 227.

[90] Trial Tr. Day 3 at 9-11.

States proceeded with demobilization last week."[91]  By mid-January 2021, Eastern States had completely extricated its materials and equipment from Developers' work sites and ceased performance under the Contracts.[92]

## F. The Aftermath of Capano's Termination

On several occasions throughout the first half of 2021, Developers contacted Eastern States to discuss completing the projects Capano had terminated.[93]  On January 11, 2021, Hensley asked Green and Gleason to attend a meeting with DelDOT and told them he did "not have any intention o[f] performing corrective work on Conleys chapel rd until . . .  we both agree on a path forward."[94]  On February 6, 2021, Hensley again emailed Gleason, this time telling him that it was Developers' goal to "work [issues] out with [Eastern States] and bring it to a closure asap because [he] would rather not fix [Eastern States'] work when [Eastern States] can do it for a fraction of the cost [than] it would cost [him]—then  we are in a payment dispute."[95]  On April 2, 2021, Developers repeatedly "demand[ed]" that Eastern States provide a remediation plan aimed at fixing the defects in its work.[96]

---

[91] JX 227.

[92] Trial Tr. Day 2 at 83.

[93] JX 229; JX 254; JX 297.

[94] JX 229.

[95] JX 254.

[96] JX 297.

Developers' post-termination requests went unanswered. As Gleason testified, "at that point we were terminated and we didn't feel like we had a relationship with [Developers] . . . to go back and work on their sites because we were told to vacate the sites."[97] Developers turned to another site developer to remediate identified issues and complete the projects. Harmony Construction met Developers' needs and worked to continue—and in some instances fix—Eastern States' work.[98]

Eastern States contends that Developers owed $1,194,121.75[99] at the time of termination. And Gleason estimated that Eastern States suffered $963,976.96 in lost profits as a result of Developers' termination of the Contracts.[100] Developers, left to bring the projects to AHJ approval, assert that they were forced to pay $4,274,368 across the four projects to repair Eastern States' defective work and to complete the land development.[101]

---

[97] Trial Tr. Day 2 165-66.

[98] Trial Tr. Day 5 at 181-182.

[99] JX 331.

[100] Trial Tr. Day 2 at 96.

[101] Trial Tr. Day 6 at 79.

**G. The Litigation**

Eastern States sued Developers.[102]  In its Amended Complaint, Eastern States asserted breach of contract and unjust enrichment claims against Developers—Darleycap, Springcap, Willowcap, and St. Anne's.[103]  Developers answered, and collectively as "Counterclaim Plaintiffs," asserted claims for declaratory judgment, breach of contract, breach of express warranties, and breach of implied warranties.[104]

Developers moved to dismiss Eastern States' complaint;[105] the Court denied the motion.[106]  Developers then endeavored to dismiss portions of Eastern States' Complaint through summary judgment.[107]  The Court denied that motion as well.[108]  The case proceeded to trial.  Over six days, from July 15, 2024, through July 22, 2024, the parties presented evidence in support of their claims and defenses.[109]  Thereafter, the Court received written briefing and oral argument from the parties.[110]

---

[102] D.I. 1.

[103] *See* Am. Compl.

[104] *See* D.I. 50 ("Am. Countercl.").

[105] D.I. 4.

[106] D.I. 8.

[107] D.I. 59.

[108] D.I 97.

[109] D.I. 101.

[110] D.I. 112, 113, 117, 118, 121, 122, 125.

### 1. *Eastern States' Claims*

Eastern States contends Developers materially breached the Contracts in two ways. First, Eastern States argues that Developers' failed to pay for work performed.[111] Eastern States alleges Developers never invoked the Notice Provision or otherwise disputed its applications for payment, running afoul of the Contracts' requirements.[112] And, when unchallenged, Eastern States maintains that those payment applications became binding contractual obligations that Developers' breached by failing to pay.[113] Second, Eastern States asserts Capano's termination acted as a material breach that "relieved Eastern States of further performance."[114]

Eastern States' proposed damages are two-pronged. Eastern States contends it is entitled to $1,194,121.75[115] for the unpaid invoices and $963,976.96 for the profits it lost as a result of Capano's termination.[116] Eastern States' total claimed damages, therefore, are $2,158,098.71. The basis for the amount owed on unpaid invoices is straightforward: Eastern States worked on Developers' projects, and

---

[111] Pl. Op. Br. 41-46.

[112] Pl. Op. Br. 42-43.

[113] Pl. Op. Br. 43.

[114] Pl. Op. Br. 46-49.

[115] JX 331.

[116] Pl. Op. Br. 49-53.

Developers did not pay for that work.[117]  As to lost profits, Eastern States posits that its trial evidence proved these damages with "reasonable certainty."[118]

Eastern States' unjust enrichment claims serve as a backstop to its contract claims; asserting that "if the Court determined that a legal remedy is not available," then Developers must pay because their retention of the money was "without justification."[119]

## 2. Developers' Counterclaims

Developers answered and counterclaimed for breach of contract.[120] Developers contend Eastern States materially breached the Contracts in three ways: "it did bad work; it missed critical deadlines; and it refused to fix errors."[121]  On the Willowcap and Springcap projects, Developers allege Eastern States' work failed to pass DelDOT inspection on several occasions and that, as a result, neither schedule was maintained.[122]  Additionally, Developers maintain that Eastern States' failure to remediate its defects constitutes a material breach of the Contracts.[123]

---

[117] Pl. Op. Br. 49-50.

[118] Pl. Op. Br. 50-52.

[119] Pl. Op. Br. 59.

[120] *See* Am. Countercl.

[121] Def. Op. Br. 31.

[122] Def. Op. Br. 33-35, 37-38.

[123] Def. Op. Br. 36.

Developers calculate their damages to total $4,274,368.[124]  This sum encompasses the costs Developers incurred to fix Eastern States' defective work, and the costs Developers incurred to complete the projects.[125]  Developers assert these damages need not be offset by any damages Eastern States alleges because, in Developers' view, "Eastern States is not entitled to any damages."[126]

Developers assert they "have proven their declaratory judgment claim based on the same facts proven to support their breach of contract claims."[127]  Similarly, Developers support their breach of warranty claims with the same factual allegations as they do their breach of contract and declaratory judgment claims.[128]

Presented with the parties' evidence at trial and having considered their posttrial briefing and argument, the resolution of this case turns on the parties' performance under the contracts.  The Court will address the various claims presented, but, in the end, this case is, at its core, a contract dispute.

---

[124] Def. Op. Br. 51.

[125] *Id*.

[126] Def. Op. Br. 56.

[127] Def. Op. Br. 42.

[128] Def. Op. Br. 41.

## III. GENERAL LEGAL PRINCIPLES

In a civil trial, "[e]ach party bears the burden of proving their respective claims and defenses by a preponderance of the evidence."[129] "Proof by a preponderance of the evidence means proof that something is more likely than not."[130] "This means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not."[131] If the evidence presented by the parties "is inconsistent, and the opposing weight of the evidence is evenly balanced, then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'"[132] To determine which party has met its burden, the Court "may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them."[133]

---

[129] *Navient Sols., LLC v. BPG Office Partners XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Ct. Apr. 27, 2023).

[130] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 2768386, at *10 (Del. Super. Ct. May 29, 2024).

[131] *Id*.

[132] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. Ct. 2005) (quoting *Eskridge v. Voshell*, 593 A.2d 589 (TABLE), 1991 WL 78471, at *3 (Del. 1991)).

[133] *Feenix Payment Sys., LLC*, 2024 WL 2768386, at *10.

In a bench trial, the Court sits as the factfinder.[134]  The Court must "assess the credibility of the witnesses and then . . . weigh all of the evidence presented."[135]  The Court is "free to accept or reject any or all of the sworn testimony, as long as it consider[s] all of the evidence presented," just as a jury does.[136]  Where the Court cannot reconcile conflicting evidence, it retains discretion to determine which evidence deserves more weight.[137]

In reaching its verdict, the Court has examined all exhibits and considered the testimony of all of the witnesses.  The fact that some particular point or concept may be mentioned should not be read as any indication that the Court did not consider all evidence and legal principles applicable to this case and to the parties' claims, counterclaims, and defenses.  It is difficult at times to completely segregate findings of fact from conclusions of law; to the extent any one of the Court's factual findings might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.  The Court has considered Delaware caselaw defining the legal precepts applicable to the claims and defenses

---

[134] *See, e.g.*, *Torres v. Bishop*, 2021 WL 6053870, at *4 (Del. Super. Ct. Dec. 21, 2021) (citing *Pencander Associated, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. Ct. June 30, 2010)).

[135] *Mundy v. Devon*, 906 A.2d 750, 755 (Del. 2006).

[136] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

[137] *Torres*, 2021 WL 6053870, at *4.

offered by the parties.  The Court applied the Delaware Rules of Evidence to the testimony and exhibits and, in its deliberation, has relied only upon that which would be admissible under those rules.  And the Court has considered each party's arguments on their respective theory of the case and any weight to be assigned to testimony or evidence.

## IV.   ANALYSIS

The parties do not dispute that their relationship is defined by contracts. Rather, they dispute their respective performance.  Their arguments in support of their claims are quite similar: both insist their performance was excused because the other party breached.  The trial revealed that both parties failed to fully perform, and the Court must determine which party, if either, was justified in their actions based on the other's failure.[138]  The Court finds that before Capano left the December 16, 2021, voicemail, neither Eastern States nor Developers adhered to the terms of the Contracts, but also finds that both parties elected to work within the relationship they had cultivated for a decade.  And, despite Eastern States' defective work, any damages must account for Developer's conclusive election to discontinue the parties' contractual relationship.

### A. The Parties' Breach of Contract Claims

The threshold question is whether Eastern States established that Developers must pay the outstanding invoices.  To answer that question, the Court must determine: first, whether Developers had a contractual duty to pay the invoices; and second, whether Developers' failure to pay is excused by any breaches of Eastern States. The Court finds that Eastern States proved the Contracts required Developers to pay the submitted invoices.  And Eastern States also proved that Developer's

---

[138] *See* Restatement (Second) of Contracts § 227.

28

failure to pay is not excused. Developers' election to have Eastern States continue its performance until Capano terminated the Contracts does not preclude Developers from recovering damages for Eastern States' breaches. The Court's reasoning follows.

### 1. Eastern States' Breach of Contract Claim.

To prevail on its claim that Developers breached the contracts, Eastern States must establish, by a preponderance of the evidence: "(1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach."[139] Under Delaware law, contracts are construed as they would be understood by an "objective, reasonable third party."[140] "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[141] Consequently, "Delaware law requires courts to enforce the plain and unambiguous terms of a contract as the binding expression of the parties' intent."[142]

---

[139] *Active Day OH, Inc. v. Wehr*, 2024 WL 3201167, at *3 (Del. Super. Ct. June 27, 2024) (internal citations omitted).

[140] *Id*. (quoting *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Properties Trust*, 2023 WL 615997, at *9 (Del. Super. Ct. Jan. 23, 2023)).

[141] *Lorillard Tobacco Co. v. Am. Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006) (citing *Rhone-Poulenc Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[142] *New Castle County v. Hersha Hospitality Mgmt., L.P.*, 2025 WL 1203501, at *7 (Del. Super. Ct. Apr. 25, 2025).

As site development continued, Eastern States, to receive payment for its work, submitted pay applications pursuant to the parties' Contracts. Eastern States contends it "timely submitted its invoices for work that it appropriately performed pursuant to the terms of the Contracts and that Developers failed to meet their payment obligations."[143] Eastern States' breach of contract claims, therefore, center on Developers' failure to pay for work performed.[144] The parties rely on different provisions of the same Contracts to support their respective positions; while Eastern States contends Developers failure to pay their debts constitutes a breach of contract, Developers assert the Contracts—and Eastern States' defective performance— justify their failure to pay.

### i. The Pay-When-Paid Provision Does Not Justify Developers' Failure to Pay Eastern States.

Developers turn to two provisions of the Contracts—Sections 5.3 and 5.5—to justify their nonpayment. Section 5.5, the "Pay-When-Paid" provision, allowed Developers to pay Eastern States using money supplied by a third-party (*e.g.*, by a bank draw) within thirty days of Eastern States' applications for payment.[145] While Eastern States insists the pay-when-paid provision "does not align with the parties'

---

[143] Pl. Op. Br. at 40.

[144] Pl. Reply Br. at 4; *See generally,* Pl. Op. Br.

[145] Contracts § 5.5.

relationship,"[146] Developers maintain the pay-when-paid provision allowed them to withhold payments until they receive funding, and, in effect, granted them permission to ignore Eastern States' invoices—and the thirty-day schedule for payment—until Developers were funded by a third-party.[147] In Developers' view, its obligation to pay Eastern States did not arise until it received funding from the third-party, and, when Developers were not paid by the third-party, they argue that Eastern States' right to receive payment had not yet accrued. Eastern States argues that even if the Pay-When-Paid provision applies, it did not shift to Eastern States "the risk of nonpayment if Developers failed to obtain payment from another source."[148]

Developers contend that the pay-when-paid provision created a condition precedent to Developers' obligation to pay Eastern States.[149] A condition precedent is an "act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises."[150] Generally, Delaware law disfavors conditions precedent "because of their tendency to work a forfeiture."[151] As such,

---

[146] Pl. Op. Br. at 25.

[147] D.I. 118 ("Def. Ans. Br.") 42.

[148] Pl. Op. Br. at 26.

[149] Def. Op. Br. at 16.

[150] *Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Ct. Sept. 22, 2020).

[151] *Id.*

"[p]arties to a contract must use unambiguous, express language to create a condition precedent capable of producing a forfeiture."[152]  Where that unambiguous language is absent, the Restatement (Second) of Contracts compels the Court to interpret the parties' contract in a way "that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk."[153]

Matters regarding pay-when-paid provisions are a question of contract interpretation.[154]  Under Delaware law, where there exists no "unambiguous intent to make receipt of payment by [Developers] a condition precedent of its obligation to pay [Eastern States], a pay-when-paid clause must be interpreted as providing the time for payment rather than a condition precedent."[155]  Where, as here, an owner fails to pay their contractor, this Court has adopted the majority view that the contractor must be paid in a "reasonable" time.[156]

Despite the differing interpretations of the provision offered by the parties, the pay-when-paid provision in their contracts "does not evince an intent to impose a

---

[152] *Id*.

[153] Restatement (Second) of Contracts § 227.

[154] *Casey Emp. Services, Inc. v. Dali*, 1993 WL 478088, at *4 (Del. Nov. 18, 1993).

[155] *McAnulla Elect. Const., Inc. v. Radius Technologies, LLC*, 2010 WL 3792129, at *7 (Del. Super. Ct. Sept. 24, 2010) (cleaned up).

[156] *Id*.

condition precedent upon [Developers'] payment obligation."[157]  As in *McAnulla*, the pay-when-paid provision "does not explicitly reference a condition precedent or employ other language shifting the risk of a default" by the third-party to Eastern States.[158]  Instead, the language providing that Eastern States' "application for payment" would be paid "out of such amounts as have been paid to" Developers sets a time for payment.  And, because Eastern States was not timely paid, the pay-when-paid provision would require Eastern States to be paid within a reasonable time.  That did not occur.

### ii. The Holdback Provision Does Not Justify Developers' Failure to Pay Eastern States.

Section 5.3, the "Holdback Provision," allowed Developers to withhold payments "in [their] sole discretion and without further notice to [Eastern States] if [Eastern States] defaults in performance. . . or fails to perform the Work in accordance with the provisions [of the contract] or if [Developers] dispute such payments."[159]  Developers argue that Section 5.3 trumps Section 5.7, rendering unnecessary any notice of dispute to Eastern States.[160]

---

[157] *Id*.

[158] *Id*.

[159] Contracts § 5.3.

[160] Def. Ans. Br. 30-31.

The Holdback Provision specifically allowed Developers to withhold payments in their sole discretion if Eastern States failed to complete its site work in accordance with the Contracts. And for more than a year, Developers did what they were allowed to do—they withheld payments to Eastern States in their "sole discretion." But Developers' decision not to pay does not mean that Eastern States must suffer at the hands of Developers' "sole discretion" forever.

### iii. Time Was Not of the Essence.

Trial testimony was devoted to explaining why projects were delayed, which party was responsible for the delays, and how that responsibility impacts the outcome of this case. Developers assert that because construction deadlines are "critically important," time was of the essence, and Eastern States' delays constituted material breaches of the contracts.[161] Developers allege Eastern States failed to complete Block K in Darley Green by December 2019, Phase 5 of Burtons Pond by July 2019, Conleys Chapel Road by June 2020, Phase 1 of Brenford Road in 2018, and all of Brenford Road by July 2020.[162] Developers concede that none of the Contracts expressly contained a "time is of the essence" clause, and, in effect, ask this Court to inject and enforce an unwritten term. The Court will not do so.

---

[161] Def. Ans. Br. 14-25.

[162] Def. Ans. Br. 17.

Delaware "law presumes contracting parties are familiar with time of the essence clauses and that they know how to make time of the essence if they so desire, especially in contracts between sophisticated business[es]."[163]  While Developers argue the delays prevented them from "being able to sell lots to homebuilders,"[164] Developers (and Eastern States) have decades of experience working in the construction industry.  Both parties are experienced and sophisticated in construction contracting, and if they wanted time to be of the essence, they would have memorialized it in their written agreements.  This Court's insertion of a "time is of the essence" clause "would be inconsistent with fundamental rules of contract interpretation, which require strict adherence to the language of the contract when its terms are clear."[165]

### iv.   Developers Never Invoked the Notice Provision

Section 5.7 of the Contracts instructed Developers to "dispute any application by [Eastern States] or other claim for payment by notice (which may be by telephone, fax or e-mail) to [Eastern States] given within seven (7) calendar days after receipt of the duly submitted application for payment or other claim for payment."[166]

---

[163] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *10 (Del. Ch. May 2, 2007).

[164] Def. Ans. Br. 16.

[165] *HIFN, Inc.*, 2007 WL 1309376, at *11.

[166] Contracts § 5.7.

Eastern States asserts its payment applications "became binding contractual obligations once the 5.7 notice period elapsed."[167] And, as a result, Eastern States asks this Court to find that Defendants breached the Contracts by failing to pay the duly submitted invoices.

Eastern States asserts it was not until this litigation that Developers actually disputed Eastern States' invoices.[168] In Eastern States' view, Developers never premised non-payment on disputed invoices, rather, "the invoices were simply past due."[169] Developers had direct and daily contact with Eastern States during the projects, but no evidence in the record reveals that Developers ever provided notice of a dispute of Eastern States' billing.

Relying on an email sent by Henlsey to Julian, Developers contend they "put Eastern States on notice that it breached the Contracts no later than September 24, 2020."[170] In this email, Hensley expressed concern with Eastern States' progress, telling Julian that "Darley Green [was] a disaster," Burtons Pond remained incomplete, and Brenford Road's sidewalks were only half complete.[171] But,

---

[167] Pl. Op. Br. 43.

[168] Pl. Op. Br. 27-28.

[169] Pl. Op. Br. 28.

[170] Def. Ans. Br. 45-46.

[171] JX 188.

"[v]oicing displeasure and asking for accountability is not the same as challenging [the] right to payment."[172]

Hensley's email identified parts of the outstanding projects in need of remediation. But Hensley did not—as the Notice Provision required—dispute Eastern States' payment applications. In fact, his communications conveyed the opposite. Despite the "fixes" identified in his e-mail, Hensley concluded his correspondence to Julian by stating: "I am not complaining so please don't interpret this the wrong way or as an excuse for the late payments as two wrongs don't make a right."[173] Developers did not invoke the Notice Provision.

### v. Developers' Breached Their Obligation to Pay Eastern States.

The parties agree that the Contracts are valid and enforceable.[174] The Court must determine whether Developers breached an obligation they owed Eastern States under the Contracts. Developers maintained one obligation: to "make payments to [Eastern States] on the basis of applications for payment submitted by [Eastern States] to [Developers] as the Work progresses."[175] Developers' payments were to be made "within thirty (30) days of receipt of [Eastern States'] application

---

[172] *Outbox Sys., Inc. v. Trimble, Inc.*, 2024 WL 1886089, at *9 (Del. Super. Ct. Apr. 30, 2024).

[173] JX 188.

[174] Pl. Op. Br. 40; Def. Op. Br. 31.

[175] Contracts § 5.1.

37

for payment."[176]  Eastern States contends Developers' materially breached their obligation to pay Eastern States under the Contracts.

"Whether a breach is material is a fact-sensitive analysis."[177]  Under Delaware law, materiality is a question for the trier of fact; it "is one of degree" and is determined by "weighing the consequences in light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case."[178]  A material breach is "a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."[179]

This Court looks to the Restatement (Second) of Contracts to determine whether a breach is material, and in doing so, weighs the following factors:

> (a) the extent to which the injured party will be deprived of a reasonably expected benefit; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into

---

[176] Contracts § 5.5.

[177] *Current Solutions, Inc. v. Appoquinimink Sch. Dist.*, 2024 WL 5103281, at *3 (Del. Super. Ct. Dec. 13, 2024).

[178] *Foraker v. Voshell*, 2022 WL 2452396, at *8 (Del. Super. Ct. July 1, 2022) (citing *Carey v. Estate of Myers*, 2015 WL 4087056, at *20 (Del. Super. Ct. July 1, 2015)).

[179] *Shore Inv., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *5 (Del. Super. Ct. Nov. 28, 2011) (quoting 23 Williston on Contracts § 63:3 (4th ed.)).

account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.[180]

The Court finds Developers materially breached the Contracts. Perhaps nothing is more fundamental to a contract for services than the concomitant obligation to pay for work performed. From Contract formation, through years of work, until Capano abruptly terminated the Contracts, Developers continually promised to pay Eastern States its outstanding invoices but never did. Developers, relying at trial on the "pay-when-paid" provision, now seek to excuse their nonpayment. But it was not until Eastern States sued for payment that Developers, for the first time, asserted Eastern States' deficient performance as justification for their nonpayment. And while the Contracts allowed Developers to "terminate t[he] Agreement[s] at any time," it did not grant them the right to avoid compensating Eastern States for its work.

### vi. Eastern States Damages

Eastern States must prove damages stemming from Developers' breach.[181] Here, Eastern States presents several unpaid invoices it directed to Developers under

---

[180] *See* Restatement (Second) of Contracts § 241.

[181] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 (Del. 2016) ("[I]n Delaware, a cause of action for breach of contract includes damages as an element.").

the terms of the Contracts. Eastern States claims it is owed $1,194,121.75—the remaining balance on unpaid invoices at the cessation of the parties' relationship.[182]

Developers may not simply ignore the invoices for the work performed at the time Capano terminated the Contracts.[183] And, the Court disagrees with Developers calculations of invoiced work related to work performed. For example, Developers argue that Eastern States' last invoice billed Springcap for 95% of the work when only half the work had been done.[184] Not so. The "Contract Sum" on Springcap was $9 million.[185] The final Springcap invoice, dated December 31, 2020, stated that $3,857,350 in work had been completed, with a $5,142,650 "Balance to Finish."[186] Dividing the value of the completed work, $3,857,350, by the value of the Springcap contract, $9,000,000, it is clear that Eastern States invoiced Developers—just as the payment application indicates—for roughly 43% of the work, not, as Developers maintain, for 95% of the work.

---

[182] Pl. Op. Br. at 49-50.

[183] *See Outbox Sys., Inc.*, 2024 WL 1886089, at *1.

[184] Def. Ans. Br. 51-56.

[185] JX 667.

[186] *Id.*

40

## 2. *Developers May Recover for Eastern States' Breaches.*

Developers responded to Eastern States' Complaint by asserting their own counterclaims for breach of contract.[187]  Developers contend Eastern States failed to: perform adequate work, meet deadlines, and remediate shoddy work.  Developers allege these failures constituted material breaches of the contracts.  Eastern States asserts that even if Developers' breach of contract counterclaim had merit, its own shortcomings were not so significant that they justified working for Developers for free.[188]

To prevail on their claim, Developers must prove: "(1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach."[189]  Developers focus on Eastern States' poor work, failure to meet deadlines, and refusal to fix errors.[190]  Generally, where "one party to a contract is confronted with its counterparty's material breach, the non-breaching party can either cancel the contract and sue for total breach or continue the contract and sue for partial breach."[191]  As this Court has explained,

---

[187] *See* Am. Countercl.

[188] Pl. Ans. Br. 53.

[189] *Active Day OH, Inc. v. Wehr*, 2024 WL 3201167, at *3 (Del. Super. Ct. June 27, 2024) (internal citations omitted).

[190] Def. Op. Br. 31.

[191] *Outbox Sys., Inc.*, 2024 WL 1886089, at *8.

41

A material breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party. Conversely, a slight breach of one party, while giving rise to an action for damages, does not terminate the obligations of the injured party under the contract. Failure to perform by the injured party after a non-material breach constitutes breach of contract by the injured party.[192]

The general rule is that Eastern States' material breach would operate to release Developers of their obligation to pay, and subsequent nonperformance by Developers, no matter the reasons articulated, would be justified.[193] But the converse of this rule is that Eastern States' non-material breaches would not terminate Developers' obligation to pay; under those circumstances, Developers' non-performance is a breach of contract.[194]

Developers argue, as the general rule instructs, that "Eastern States' prior breaches excuse all [of] Developers' payments."[195] Not so. Developers cannot absolve their past debts under the contracts and reap the benefits of Eastern States' work simply because Eastern States failed to complete the contract. In fact, "[a]n exception to the general rule that a material breach excuses the nonbreaching party's

---

[192] *Foraker*, 2022 WL 2452396, at *7 (cleaned up).

[193] See *Eastern Elec. and Heating, Inc.* v. *Pike Creek Professional Center*, 1987 WL 9610, at *4 (Del. Super. Ct. Apr. 7, 1987).

[194] *Id.* (citing 11 *Williston on Contracts* § 1292, at 8 (3d ed. 1968)).

[195] Def. Ans. Br. 49.

performance exists where the nonbreaching party chooses to maintain its benefits under the contract."[196]  This Court has held:

> Where there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and *conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform*.  In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.[197]

Developers kept Eastern States working despite its present claim that Eastern States' work was defective or untimely.  Developers, having waived Eastern States breaches at the time of their occurrence as a matter of course, cannot retrospectively avoid the obligation to pay for that work.[198]

### i.  *Developers Elected to Continue the Contracts.*

Developers—with knowledge of Eastern States' deficient performance—continued the Contracts.  Their decision to abruptly terminate the contracts once thousands of dollars in unpaid bills accrued "does not mean the balance is any less

---

[196] *Outbox Sys., Inc.*, 2024 WL 1886089, at *11.

[197] *Id.* (emphasis in original) (internal citations omitted).

[198] *See Outbox Sys., Inc.*, 2024 WL 1886089, at *11.

due."[199]   Throughout 2019 and 2020, Developers repeatedly indicated their intent and willingness to continue the Contracts.  Developers may not disregard the unpaid invoices.

Developers' focus on the Willowcap and Springcap projects as evidence of Eastern States' poor work.[200]  As to Willowcap, Developers knew of Eastern States defective work for more than a year before Capano terminated the Contracts.  On April 30, 2019, Scott, the DelDOT employee overseeing progress on Willowcap, emailed Hensley to inform Developers that DelDOT identified areas of Brenford Road that needed to be replaced to comply with DelDOT's rideability standards.[201] Nonetheless, Developers reaffirmed their belief in Eastern States' capability and committed to a sixty-day payment schedule.[202]  As for Burtons Pond, Developers knew of defects as early as September 2020, when Hensley emailed Julian and detailed the deficient work.[203]

Nonetheless, Developers focus on three "critical deadlines" that Eastern States failed to meet.[204]  Under the Contracts, Eastern States agreed to complete: (1)

---

[199] *See Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *8 (Del. Super. Ct. Feb. 25, 2022).

[200] Def. Op. Br. 1-5.

[201] Trial Tr. Day 4 at 147-48; JX 118.

[202] Trial Tr. Day 1 at 140.

[203] JX 186.

[204] Def. Op. Br. 19-21.

Block K in Darley Green by December 2019,[205] Conleys Chapel Road by June 2020,[206] and Brenford Road Phase 2 by July 2020.[207] Developers assert myriad factors for Eastern States' inability to meet these deadlines: demobilizations, poor work, and lack of manpower.[208] Eastern States, for its part, generally asserts that Developers own conduct caused the delays.[209] Who or what caused the delays, in the end, is immaterial to the Court's analysis. After the deadline lapsed, Developers had two choices: continue to perform under the contract or to cease to perform and sue for breach of contract.[210] They chose to continue.

Despite the various delays and knowledge of defective work, Developers, on several occasions, indicated their willingness to continue performance under the Contracts. On September 24, 2020, months after each deadline had lapsed, and with knowledge of Eastern States' defective work, Hensley, on behalf of Developers, emailed Julian to inform him that, despite the issues, Developers "would like to continue [the parties'] great relationship and get through everything."[211] Hensley

---

[205] JX 123.

[206] JX 114.

[207] JX 147.

[208] Def. Ans. Br. 1, 24, 26.

[209] Pl. Ans Br. 41-43.

[210] *See Outbox Sys., Inc.*, 2024 WL 1886089, at *11.

[211] JX 186.

did not convey that Eastern States should stop work or that Developers intended to terminate the Contracts. In fact, Hensley began his email with a proposal that would "keep things moving and . . . get back on track."[212] Eastern States kept working.

The next morning, Julian responded that it was Eastern States' intent to "perform items we owe to [Developers]."[213] Two weeks later, on October 2, 2020, Julian followed up and informed Hensley that Eastern States "ha[d] performed all of the work items committed to in the email below," the Springcap work was scheduled for the following week, and a third-party contractor was currently scheduling the Willowcap repaving.[214] Again, despite now-alleged breaches, Developers compelled Eastern States to press on. Developers never conveyed an intent to cancel the Contracts.

Developers continued to induce Eastern States' performance under the Contracts. On November 10, 2020, Hensley emailed Green and Gleason, asking them to "order the pipe if [they] ha[d] not done so," because Hensley heard there was a "pipe shortage" on the Darley Green project.[215] On December 1, 2020, Hensley promised to "[p]ay Burtons 160k before the end of [that] week."[216] On

---

[212] JX 186.

[213] JX 188.

[214] *Id*.

[215] JX 199.

[216] JX 207.

46

December 8, 2020—eight days before Capano terminated the Contracts—Hensley emailed Gleason and asked Eastern States to "send good schedules over for Darley Green, willowwood, and burtons pond for us to review . . . [We] are thinking of ways to keep both parties satisfied moving forward."[217]

Until Capano's fateful call, Developers engaged in conduct indicating an intention to continue the contract.[218] Developers induced Eastern States to continue its work even though Developers were aware of the defects it now claims constitute material breaches. As a result, their obligation to pay Eastern States under the Contracts was not discharged.

### ii. Developers May Recover for Eastern States' Defective Work

Eastern States' defective work constitutes a breach for which Developers may recover. Under the Contracts, Eastern States was obligated to perform its work: (i) in compliance with local regulations; and (ii) in a "workmanlike manner."[219] Eastern States breached these obligations.

DelDOT, the agency responsible for ensuring Eastern States' work complied with local regulations, specifically rejected Eastern States' work on several occasions. All four DelDOT witnesses—the "ultimate decider[s] of whether or not

---

[217] JX 222.

[218] *Id*.

[219] Contracts § 2.1.

a roadway meets specifications in Delaware"—were consistent in concluding that Eastern States performed defective work.[220]  In January 2019, Eastern States' work on Brenford Road failed to pass DelDOT inspection; DelDOT, based on a profilograph test, concluded there were a significant number of areas where Brenford Road needed to "be removed and replaced."[221]  Over a year later, on September 10, 2020, DelDOT's conclusion remained the same: "[t]he first phase of Brenford Rd. that was completed by Eastern States . . . requires removal and replacement."[222]

Eastern States spent the next two months attempting to correct its noncompliant work.  It failed.  On December 3, 2020, DelDOT found "non-compliant work that require[d] correction" on Brenford Road.[223]  According to Scott, the Brenford Road issues were not "punch list" items.[224]

Kevin Gorman testified in detail regarding Eastern States' failure to meet DelDOT's rideability specifications on Willowcap, the "longevity issue[s]"[225] associated with Eastern States' high asphalt paving, and Developers' "costly and

---

[220] Trial Tr. Day 5 at 16.

[221] Trial Tr. Day 4 at 159; JX 118.

[222] JX 184.

[223] JX 211.

[224] Trial Tr. Day 4 at 168.

[225] Trial Tr. Day 5 at 88.

time-consuming" remediation efforts.[226]  Gorman, a civil engineer, explained that DelDOT required roads to contain zero quarter-inch deflections, and concluded, based on several accepted tests, that Eastern States' paving of Brenford Road suffered from ninety-eight quarter-inch deflections.  The road ran afoul of DelDOT's requirements.[227]

Similar failures existed in Eastern States' work at Springcap, specifically Burtons Pond and Conleys Chapel Road.  There, according to DelDOT, Eastern States' construction resulted in "rideability issues in front of both entrances where against [our] recommendation [Eastern States] pulled the entrances and the deceleration lane before they pulled the mainline."[228]  In other words, Eastern States' failure to comply with DelDOT's recommendation resulted in noncompliant work and ultimately, a breach of the Contract.

Under Delaware law, where a company holds themselves out as a competent contractor to perform certain labor, the law presumes that the company "possesses the requisite skill to perform such labor in a proper manner, and implies as a part of [the] contract that the work shall be done in a skillful and workmanlike manner."[229]

---

[226] Trial Tr. Day 5 at 28.

[227] Trial Tr. Day 5 at 45.

[228] JX 158.

[229] *August v. Hernandez*, 2020 WL 95658, at *2 (Del. Super. Ct. Jan. 6, 2020) (cleaned up).

49

Deciding whether Eastern States' work was performed in a "workmanlike manner" requires the Court to consider if it "displayed the degree of skill or knowledge normally possessed by members of their profession or trade in good standing in similar communities" in performing the work.[230]  While Developers were "not entitled to excellence," the standard requires Eastern States to have exhibited "reasonableness and requires compliance with the building code."[231]  Based on DelDOT's persistent issues with Eastern States' work, the Court finds that Eastern States breached its contractual obligation to perform "in a workmanlike manner."

Developers' claim for damages is supported by the Contracts, under which Developers had the option to "remedy any defects and deficiencies" present in Eastern States' work.[232]  Once Developers exercised that option, the Contracts explicitly required that "[Eastern States] shall correct at its expense."[233]

### iii. Developers May Not Recover for Eastern States' Failure to Finish Its Work

Developers argue they "are owed $4,351,703 for the costs to fix and finish Eastern States' defective work."[234]  After Capano terminated the Contracts,

---

[230] *Foraker*, 2022 WL 2452396, at *10 (quoting *Shipman v. Hudson*, 1993 WL 54469, at *3 (Del. Super. Ct. Feb. 5, 1993)).

[231] *Foraker*, 2022 WL 2452396, at *10.

[232] Contracts § 2.1.

[233] *Id*.

[234] Def. Op. Br. 58.

Developers hired third-party contractors to correct Eastern States' defective work, and Developers will be compensated for that. Awarding those costs makes sense; Eastern States' work was, on many occasions, defective and constituted a breach of the Contracts. But Developers' need for third-party remediation was also a consequence of their own actions. In other words, they were tasked to finish Eastern States' work because Capano expressly ordered Eastern States not to return to all job sites.

The Contracts permitted Developers, in the event Eastern States breached the Contracts, to "five (5) days after written notice, (i) proceed to have the Work performed by others, in which event any expenses for labor and materials incurred to finish the Work will be treated as a back charge against this Agreement, and/or (ii) terminate this Agreement at any time."[235] This provision, in effect, allowed Developers to back charge Eastern States if Eastern States, in response to Developers' written notice, refused to fix its work. But the Court has not found—nor have Developers proffered—any evidence that Developers gave Eastern States written notice within five days of Capano's voicemail. Instead, they were "thinking of ways to keep both parties satisfied moving forward."[236] And, the Court cannot interpret this provision to mean that Developers were allowed to terminate Eastern

---

[235] Contracts at 2.

[236] JX 222.

51

States on a whim and then back charge Eastern States for work Developers' own actions prevented Eastern States from completing.

When Julian was asked why Eastern States did not return to the projects to fix certain issues, his answer was simple: "Because we were terminated . . . . [A]t the end of the day [Developers] told us to get all our stuff and get off their jobs. It never really. . . changed from that."[237] While certain issues persisted—Conleys Chapel Road was half-paved—Capano's termination was clear. Eastern States was to pack its equipment, exit the job sites, and not return. Once Developers materially breached the Contracts, they could no longer complain that Eastern States subsequently refused to perform.[238] In the end, Developers' material breach relieved Eastern States of its contractual obligations, and Eastern States' subsequent nonperformance was justified.

### 3. *Eastern States' Claim for Lost Profits Fails*

Eastern States asserts it "incurred lost profits that it justifiably expected to achieve" through completion of Developers' projects.[239] To support this claim, Gleason testified—based on his own calculations—that Eastern States lost profits in the amount of $963,976.96: for Darley Green Phase 3, $281,923.71, for Burton's

---

[237] Trial Tr. Day 1 at 171-72.

[238] *See, e.g., Frunzi v. Paoli Servs., Inc.*, 2012 WL 2691164, at *7 (Del. Super. Ct. July 6, 2012).

[239] Pl. Op. Br. 36.

Pond, $538,435.46, for Willowood Phases 6 & 7, $19,766.04, and for Willowood Phases 8 & 9, $123,861.75.[240] Gleason possessed no formal training on lost profit calculations, lacked expertise on damages, and did not seek knowledge or guidance from any other sources to guide his calculation of lost profits.[241] Instead, Gleason, on behalf of Eastern States, simply used profit margins he "thought [were] fair."[242]

The Court, over Developers' objection, allowed Gleason to testify in support of Eastern States' lost profits claim. Delaware law allows a court to hear evidence in a bench trial that might otherwise be excluded from a jury "as jury confusion in that context is not a concern."[243] And, the Court endeavored to confine Eastern States' lost profit testimony within the permissible parameters of a fact witness.[244] Nevertheless, Eastern States failed to prove, by a preponderance of the evidence, its entitlement to lost profit damages.

"It is axiomatic that a claim for lost profits requires evidence of lost revenues, minus the costs associated with generating those revenues."[245] Under Delaware law,

---

[240] Trial Tr. Day 2 at 92-96.

[241] Trial Tr. Day 2 at 172-173.

[242] Trial Tr. Day 2 at 175.

[243] *City of Wilmington v. Flamer*, 2013 WL 4829585, at *6 (Del. Super. Ct. May 22, 2013).

[244] Trial Tr. Day 2 at 98.

[245] *Empire Fin. Servs., Inc. v. Bank of New York (Delaware)*, 2007 WL 1991179, at *4 (Del. Super. Ct. June 19, 2007).

"no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."[246] Gleason's lost profits calculation was conjectural and speculative as it was contingent upon Eastern States' work progressing precisely according to plan from beginning to end. His calculations were based on the numbers Eastern States "expected when [it] started the project[s]."[247] Gleason compared Eastern States' original budget to the original contract amount, thereby eliminating the impact of change orders, amendments, or any other variable that may have affected the numbers as the parties' work continued.[248] Gleason acknowledged that "number[s] fluctuate[]" based on external factors and agreed that throughout his calculations, he did not "consider any risk factors whatsoever."[249] As Gleason put it, "sometimes the proposed or expected [number] when we start a job is not exactly as it is when we finish the job."[250] These variables can—and in this case did—affect profits, and Gleason failed to factor these variables in his calculations.

---

[246] *Siga Tech., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (quoting *Siga Tech., Inc. v. PharmAthene, Inc*., 67 A.3d 330, 351 (Del. 2013)).

[247] Trial Tr. Day 2 at 177.

[248] Trial Tr. Day 2 at 175-177.

[249] Trial Tr. Day 2 at 173.

[250] Trial Tr. Day 2 at 176-177.

Gleason candidly revealed this variability. For example, Eastern States' original estimates projected it would return a 9.02% profit margin on Brenford Road, but Brenford Road's "current profit margin" turned out to be negative 9.83%.[251] And these variations cut both ways—Eastern States' original projections showed a 15.95% return on Willowwood 6 and 7; its current estimate increased to 22.09%.[252] Regardless of the actual progression of the projects, Gleason's basis remained the same: Eastern States' original projections.

Under certain circumstances, "[r]esponsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however."[253] On the evidence offered here, an award of lost profits would be grounded in guesswork, and the Court can make no responsible estimate. Eastern States' claim for lost profits is denied.

### 4. Eastern States' Unjust Enrichment Claim

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles

---

[251] Trial Tr. Day 2 at 178.

[252] Trial Tr. Day 2 at 184.

[253] *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (internal citations omitted).

of justice or equity and good conscience."[254]  An unjust enrichment claim may be brought "as a standalone claim or as a remedy for other claims."[255]  To sustain a claim for unjust enrichment, the plaintiff must establish: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[256]

An unjust enrichment claim cannot be made where the parties' relationship is "comprehensively governed by a contract."[257]  The Superior Court may award damages for unjust enrichment "when it cannot hold the parties to a formal agreement but determines that the aggrieved party is entitled to relief for a benefit conferred on the other party."[258]

Here, the parties agree that the Contracts are valid and enforceable.  Because Eastern States and Developers' relationship was "comprehensively governed by a contract,"[259] Eastern States' unjust enrichment claim is dismissed.

---

[254] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (quoting 66 Am. Jur. 2d, *Restitution and Implied Contracts* §3, p. 945 (1973)).

[255] *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023).

[256] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[257] *Chumash Capital Investments, LLC v. Grand Mesa Partners, LLC*, 2024 WL 1554184, at *14 (Del. Super. Ct. Apr. 10, 2024).

[258] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

[259] *Chumash Capital Investments, LLC*, 2024 WL 1554184, at *14.

### 5. *Developers' Breach of Warranty Claims is Duplicative of Their Breach of Contract Claims*

Eastern States cannot, as Developers assert, be in breach of the Contracts and also in breach of the express and implied warranties.[260]  Under Delaware law, "when a party alleges a breach of contract and breach of warranty claim based on the same contractual provisions and facts, one claim may be dismissed."[261]

Here, Developers ground both their breach of contract claims and their breach of warranty claims on Eastern States' failure to perform its work in a "workmanlike manner" and "to comply with DelDOT specifications."[262]  On both claims, Developers rely on the same facts and the same provisions of the Contracts.  Notably, Developers do not claim any separate and distinct damages on their breach of warranty claims; instead, they rely solely on the damages they assert are necessary to compensate them for Eastern States' breaches of contract.  The Court dismisses Developers' breach of warranty claims as duplicative of their breach of contract claims.[263]

---

[260] Def. Op. Br. 41.

[261] *RSM US LLP v. Cision US Inc.*, 2025 WL 819123, at *2 (Del. Super. Ct. Mar. 14, 2025) (citing *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554 (Del. Ch. Nov. 19, 2013).

[262] Def. Op. Br. 41.

[263] *See Outbox Sys.*, 2022 WL 3696773, at *9.

### 6. Developers' Declaratory Judgment Claim is Duplicative of Their Breach of Contract Claims

Developers seek a declaration that they did not violate the Contracts and properly used the Holdback Provision.[264] But like their breach of warranty claims, Developers' claim of declaratory judgment fails because it is duplicative. And the Court declines offer a declaration pertaining to the parties' contractual relationship beyond its verdict on the breach of contract claims.

A declaratory judgment "is a statutory action . . . meant to provide relief in situations where a claim is ripe but would not support an action under common-law."[265] While "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate,"[266] under Delaware law, "there is no need for a declaratory judgment . . . where a claimant merely has repackaged in the language of a declaration an adequately-pleaded affirmative count[.]"[267] A request for a declaratory judgment must be rejected where it "relates

---

[264] Am. Countercl. ¶ 106.

[265] *Loeffler v. MNTN, Inc.*, 2025 WL 1256148, at *4 (Del. Super. Ct. Apr. 28, 2025) (internal citation omitted).

[266] Super. Ct. Civ. R. 57.

[267] *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *15 (Del. Super. Ct. Sept. 29, 2021).

wholly and completely to the claim asserted in the complaint."[268]   To survive dismissal, a decision on the affirmative counts must not resolve the declaratory count.[269]

Developers' argument that it did not breach the Contracts mirrors their breach of contract claims.  Their declaratory judgment claim seeks a ruling on the same legal issues addressed in their Answer, Counterclaims, and throughout this Opinion—whether Developers violated the Contracts.  The Court's resolution of the parties' contract dispute resolves the declaratory judgment claim.   Thus, the declaratory judgment claim adds nothing new, is duplicative, and is dismissed.  To the extent Developers seek a declaration regarding their own future conduct, including use of the Holdback Provision, such a claim is speculative and not ripe for decision.[270]

---

[268] *DuPont De Nemours, Inc. v. Hemlock Semiconductor Operations LLC*, 2024 WL 3161799, at *11 (Del. Super. Ct. June 10, 2024) (citing *IP Network Sols., Inc. v. Nutanix, Inc.*, 2022 WL 369951, at *7 (Del. Super. Ct. Feb. 8, 2022)).

[269] *Blue Club Spinco LLC*, 2021 WL 4453460, at *15.

[270] *See Loeffler*, 2025 WL 1256148, at *5.

## V. DAMAGES

"Under Delaware law, the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach."[271] It is well-settled that breach of contract damages "are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall."[272]

To assess the parties' damages, the Court considers Eastern States' submitted invoices and the testimony of Paul Pocalyko ("Pocalyko"), a forensic accountant Developers proffered at trial.[273] Pocalyko's testimony focused on two categories of damages: the costs Developers incurred to repair Eastern States' defective work, and the costs Developers incurred to complete Eastern States' work.[274] In this case, both parties are entitled to damages based on their breach of contract claims. The Court addresses the damages associated with each project in turn.

---

[271] *Siga Tech., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132-33 (Del. 2015) (internal citation omitted).

[272] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal citations omitted).

[273] Trial Tr. Day 6 at 63-66.

[274] Trial Tr. Day 6 at 74.

## A. Willowcap

Eastern States met its burden of proving, by a preponderance of the evidence, that Developers breached the Willowcap contract by failing to compensate Eastern States for its work on the project and by abruptly terminating the Contract. To assess Eastern States' damages on Willowcap, the Court looks to its submitted pay applications.[275] The unpaid invoices on Willowcap totals $638,813.17.[276] Eastern States' damages must be offset by $545,310—the costs Developers incurred to fix Eastern States' deficient work.[277] On this calculation, the Court awards Eastern States $93,503.17 on the Willowcap claim.

## B. Darleycap

Eastern States has met its burden of proving, by a preponderance of the evidence, that Developers breached the Darleycap contract by failing to compensate Eastern States for its work on the project. The outstanding amount reflected in its invoices totals $106,913.19.[278] Developers assert they are owed $796,247.00 for the costs "to finish" Darleycap, but as explained, the Court intends only to award damages to Developers for Eastern States' defective work.[279] And, according to

---

[275] JX 668; JX 331.

[276] JX 331.

[277] Trial Tr. Day 6 at 86.

[278] JX 331.

[279] Def. Op. Br. 51.

Pocalyko, "the work [was] all incomplete work[,] there [was] no defective work" included in his calculations.[280]   The Court, therefore, awards Eastern States $106,913.19 on the Darleycap claim.[281]

## C. Springcap

Eastern States has met its burden of proving, by a preponderance of the evidence, that Developers breached the Springcap contract by failing to compensate Eastern States for its work on the project.  The outstanding amount reflected in its invoices totals $444,659.39.[282]   These damages must be offset by the amount Developers paid to fix Eastern States' work on Springcap.  That amount, according to Pocalyko, was $432,843.00.[283]   Based on the damages reflected in the invoices, less the costs Developers incurred to fix Eastern States' defective work on Springcap, Eastern States is awarded $11,816.39 for the Springcap claim.[284]

---

[280] Trial Tr. Day 6 at 88.

[281] Developers assert that a proper accounting must be made for payments made toward the Darleycap balance after the parties severed their relationship.  Def. Ans. Br. at 51.  These payments, documented in JX 394 and JX 454, shall be accounted for in the final form of order to be prepared and submitted by the parties.  For Darleycap, Developers will be credited $106,410.97.

[282] JX 331.

[283] Trial Tr. Day 6 at 84.

[284] As noted in note 280, supra, Developers shall be credited in the final accounting for the $61,337.81 payment made on the Springcap account.  JX 454.

## D. St. Anne's

There were no unpaid invoices on St. Anne's.[285]  Eastern States sought only lost profits for this project.[286]  The Court has found Eastern States failed to prove its lost profits claims.  On the St. Anne's project, "there [was] no defective work items, there [was] just incomplete work."[287]  Accordingly, there are no damages associated with the St. Anne's claims.

## E. Attorneys' Fees

Both parties have requested attorneys' fees from one another.[288]  "Delaware law follows the American Rule, under which litigants are generally responsible for paying their own litigation costs."[289]  But this Court recognizes "limited exceptions" to the American Rule, including where "there is a contractual provision regarding entitlement to attorneys' fees."[290]  Developers assert the Contracts' indemnity provision entitles them to attorneys' fees in this case.

Under the Contracts, Eastern States agreed to "defend, indemnify and save harmless [Developers]. . . from any and all liability. . . including the cost of defense

---

[285] Am. Compl. ¶ 45.

[286] Am. Compl. ¶¶ 43-46.

[287] Trial Tr. Day 6 at 90.

[288] *See* Am. Compl.; *See* Am. Countercl.

[289] *DeMatteis v. RiseDelaware Inc.*, 315 A.3d 499, 508 (Del. 2024).

[290] *In re Delaware Public Sch. Litig.*, 312 A.3d 703, 716 (Del. 2024).

and attorneys' fees, arising from [Eastern States'] performance under this agreement." Developers contend this provision requires Eastern States to pay the cost of their attorneys' fees.[291] Not so. As this Court has explained,

> Indemnity provisions covering first-party claims aren't the norm in Delaware. In fact, indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement. If the provision is to apply to first-party claims, that intent must be via a clear and unequivocal articulation . . . . As a general matter, this Court has found previously that the use of "indemnify" and "hold harmless" in an indemnity provision demonstrate an intent to indemnify third-party claims only.[292]

Here, there is no "clear and unequivocal articulation" that Eastern States and Developers intended to allow indemnity of attorneys' fees resulting from actions between each other. And while there exist additional, limited exceptions to the American Rule, none apply here.[293] The Court, therefore, declines to award attorneys' fees in this case.

---

[291] Def. Op. Br. 52-53.

[292] *Fortis Advisors LLC v. Boston Dynamics Inc.*, 2025 WL 1356521, at *5-6 (Del. Super. Ct. Apr. 29, 2025) (cleaned up).

[293] See *In re Delaware Public Sch. Litig.*, 312 A.3d at 716.

## VI.   CONCLUSION

Judgment is entered in favor of Eastern States on its breach of contract claims, and in favor of Developers on its counterclaims for breach of contracts.  Offsetting the damages awarded to each, the Court awards Eastern States $212,232.75 plus pre-judgment interest.  The parties shall prepare a form of final order of judgment consistent with this decision.  The order shall account for the payments made by Developers after the breaches and before trial: $106,410.97 to Darleycap, and $61,337.81 to Springcap,[294] and shall be submitted by October 31, 2025.

IT IS SO ORDERED

_____
Sean P. Lugg, Judge

---

[294] *See supra* notes 280 and 283; JX 394, JX 454.